UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

DASSAULT FALCON 900 EX,
SERIAL NUMBER 007,
TAIL NUMBER T7-ESPRT,

    Defendant *In Rem*.

_____/

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

  Plaintiff, United States of America, through the undersigned Assistant United States Attorneys for the Southern District of Florida and Trial Attorney for the U.S. Department of Justice, National Security Division, files this verified civil complaint for forfeiture *in rem* and alleges as follows:

### NATURE OF THE ACTION

  1.  This is a civil action *in rem* to forfeit a Dassault Falcon 900 EX, serial number 007, tail number T7-ESPRT (the "Defendant Aircraft"), seized on or about May 23, 2024, in Santo Domingo, Dominican Republic, at the request of the United States and currently located in Fort Lauderdale, Florida.



2.     The grounds for forfeiture are violations of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701–1709, and related Executive Orders ("E.O.") sanctioning Nicolás Maduro Moros ("Maduro") and his representatives in the Bolivarian Republic of Venezuela ("the Maduro Regime"); smuggling of goods from the United States, in violation of 18 U.S.C. § 554; violations of the Export Control Reform Act of 2018 ("ECRA"), 50 U.S.C. §§ 4801–4852, and the Export Administration Regulations ("EAR"), 15 C.F.R. parts 730–774; and money laundering, in violation of 18 U.S.C. § 1956.

3.     The Court has jurisdiction over this subject matter under 28 U.S.C. §§ 1345 and 1355.

4.     The Court has *in rem* jurisdiction over the Defendant Aircraft under 28 U.S.C. § 1355.

5.     The Court has venue over this action under 28 U.S.C. §§ 1355 and 1395.

## STATUTORY AND REGULATORY BACKGROUND

### I.        IEEPA and Venezuela-Related Sanctions

6.        Under IEEPA, the President of the United States is granted authority to deal with unusual and extraordinary threats to the national security, foreign policy, or economy of the United States. 50 U.S.C. § 1701(a). IEEPA authorizes the President to declare a national emergency with respect to such threats through Executive Orders that have the full force and effect of law.

7.        Since 2014, the United States has imposed incremental sanctions on targeted individuals, entities, and sectors in Venezuela to address the increasing political oppression and corruption in Venezuela that began shortly after Maduro assumed office in March 2013.

8.        On March 8, 2015, the President issued E.O. 13692, which found that the situation in Venezuela, including certain actions and policies of the Government of Venezuela under Maduro, constituted an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States and declared a national emergency pursuant to IEEPA to deal with that threat. 80 Fed. Reg. 12747 (March 8, 2015).

9.        In multiple subsequent Executive Orders, in 2017, 2018, and 2019, the President took additional steps regarding the national emergency declared in E.O. 13692, which remain in effect today.

10.        Among those Executive Orders, on August 5, 2019, the President issued E.O. 13884, taking further steps with respect to the national emergency declared in E.O. 13692 "in light of the continued usurpation of power by Nicolás Maduro and persons affiliated with him, as well as human rights abuses, including arbitrary or unlawful arrest and detention of Venezuelan citizens, interference with freedom of expression, including for members of the media, and ongoing attempts to undermine Interim President Juan Guaido and the Venezuelan National Assembly's

exercise of legitimate authority in Venezuela." *See* 84 Fed. Reg. 38843 (Aug. 5, 2019).

11.     Section 1 of E.O. 13884 blocks all property and interests in property of the "Government of Venezuela" that are in the United States or in the possession or control of any U.S. person.

12.     Section 6(d) of E.O. 13884 defines "Government of Venezuela" as "the state and Government of Venezuela, any political subdivision, agency, or instrumentality thereof, including the Central Bank of Venezuela and Petroleos de Venezuela, S.A. ('PdVSA'), any person owned or controlled, directly or indirectly, by the foregoing, and any person who has acted or purported to act directly or indirectly for or on behalf of, any of the foregoing, including as a member of the Maduro regime."

13.     Sections 3 and 4 of E.O. 13884 prohibit (1) the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to the order, including the Government of Venezuela as defined in § 6(d); (2) the receipt of any contribution or provision of funds, goods, or services from any such person; (3) any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in the order; and (4) any conspiracy formed to violate any of the prohibitions set forth in the order.

14.     On July 11, 2019, the Department of the Treasury's Office of Foreign Assets Control ("OFAC"), under the authority of E.O. 13850, designated Venezuela's Directorate General of Military Counterintelligence ("DGCIM") for operating in Venezuela's defense and security sector. As a result, U.S. persons are generally prohibited from engaging in transactions with and for the benefit of the DGCIM. *See* E.O. 13850, § 3.

15.     To further implement E.O. 13692 and subsequent Executive Orders, OFAC also

issued the Venezuela Sanctions Regulations. *See* 31 C.F.R. part 591. The Venezuela Sanctions Regulations incorporate by reference the prohibitions set forth in the orders. *See* 31 C.F.R. § 591.201.

## II.   ECRA and the EAR

16.    ECRA grants the President the authority, among other things, to control "the export, reexport, and in-country transfer of items subject to the jurisdiction of the United States, whether by United States persons or by foreign persons." 50 U.S.C. § 4812(a).

17.    ECRA further grants the Secretary of Commerce the authority to establish the applicable regulatory framework. *Id.* § 4813.

18.    Under that authority, the Department of Commerce ("DOC") reviews and controls the export of certain items, including goods, software, and technologies, from the U.S. to foreign destinations through the EAR, 15 C.F.R. parts 730–774.

19.    In particular, the EAR restricts the export of items that could significantly contribute to the military potential of other nations or could be detrimental to the foreign policy or national security of the United States.

20.    The EAR imposes licensing and other requirements for items subject to the EAR to be exported lawfully from the United States or lawfully reexported from one foreign destination to another.

21.    The most sensitive items subject to EAR controls are identified on the Commerce Control List ("CCL"), published at 15 C.F.R. part 774, Supp. No. 1.

22.    CCL items are categorized by Export Control Classification Number ("ECCN"), each with export control requirements depending on destination, end use, and end user.

23.    In addition to license requirements for items specified on the CCL, 15 C.F.R.

§ 744.21 prohibits, among other things, the "export, reexport, or transfer (in-country)" of "any item subject to the EAR listed in supplement no. 2 to [part 744] without a license if, at the time of the export, reexport, or transfer (in-country)," the exporter has "'knowledge' . . . that the item is intended, entirely or in part, for a . . . Venezuelan 'military end user.'"

24.     A "military end user" is defined to include "the national armed services" and "government intelligence or reconnaissance organizations." 15 C.F.R. § 744.21(g).

25.     Similarly, 15 C.F.R. § 744.22 prohibits, among other things, the "export, reexport, or transfer (in-country)" of "any item subject to the EAR without a license from BIS [the U.S. Bureau of Industry and Security Office of Export Enforcement] if, at the time of the export, reexport, or transfer (in-country)," the exporter has "'knowledge' that the item is intended, entirely or in part, for a 'military-intelligence end user'" in Venezuela.

26.     "Military-intelligence end user" is defined to include "any intelligence or reconnaissance organization of the armed services," and the definition specifically identifies Venezuela's DGCIM as such an end user. 15 C.F.R. § 744.22(f)(2).

## III.    Requirement to File Electronic Export Information

27.     Pursuant to the Federal Trade Regulations, 15 C.F.R. part 30, electronic export information ("EEI") must be filed through the Automated Export System ("AES") for all exports valued over $2,500 and all exports requiring an export license issued by an appropriate government agency.

28.     These requirements aim to strengthen the Government's ability to prevent the export of certain items to unauthorized destinations and end users because the AES aids in targeting, identifying, and, when necessary, confiscating suspicious or illegal shipments before exportation.

29.     A material part of the EEI and AES, as well as other export filings, is information concerning, among other facts, the ECCN, the license number granting authority for the export, ultimate consignee, and country of ultimate destination of the export.

30.     The true identity of the ultimate consignee or end-user will determine whether the goods: (a) may be exported without any specific authorization or license from the U.S. Government; (b) may be exported with the specific authorization or license from the U.S. Government; or (c) may not be exported from the United States.

31.     On June 29, 2020, BIS revised 15 C.F.R. § 758.1(b)(10) to require the filing of an EEI for all items on the CCL destined for Venezuela, regardless of the shipment's value. 85 Fed. Reg. 23459 (April 28, 2020).

## FACTUAL BACKGROUND

**I.     Straw Purchase and Smuggling of the Defendant Aircraft to Venezuela**

32.     In 2023, the Defendant Aircraft was purchased and smuggled from the United States to Venezuela using a third-party straw purchaser and intermediary destination for the ultimate benefit of the Maduro Regime.

33.     Specifically, on or about January 23, 2023, a company purportedly based in St. Vincent and the Grenadines ("Foreign Company 1") purchased the Defendant Aircraft from a Florida-based limited liability company ("Florida Company 1").

34.     Foreign Company 1 concealed the fact that they were representing or associated to the Maduro Regime during the purchase process.

35.     The purchase price for the Defendant Aircraft was $13,250,000.

36.     The individual in charge of purchasing the Defendant Aircraft on behalf of Foreign Company 1 ("Foreign Principal 1") is a Venezuelan national connected to the Maduro Regime.

37.     An investigation into Foreign Company 1 has revealed it acted as a nominee owner of an aircraft beneficially owned and used by the Maduro regime, the Defendant Aircraft. According to corporate and official documents from St. Vincent, Foreign Company 1 was formed on or about June 24, 2022, as an "Assets Holding Company." In or about May 2024, the St. Vincent and the Grenadines Financial Services Authority struck Foreign Company 1 from its Register for failure to pay its annual fees. The records later show a September 2024 payment for "Resignation of Agent," and no further corporate activity in the public record.

38.     The funds used to purchase the Defendant Aircraft were wired in multiple transfers to an escrow account held by Florida Company 1 in the United States.

39.     Those wires originated from different countries, including Malaysia, using both U.S. Dollars and Euros.

40.     Although the individuals who acted on behalf of Foreign Company 1 for the purchase used emails with an Emirati domain suffix, those individuals had Spanish names and some of the emails contained the phrase "Enviado desde mi iPhone," which is Spanish for "sent from my iPhone."

41.     On or about April 3, 2023, the Defendant Aircraft was exported from the U.S. and transshipped to Venezuela through an intermediary destination.

42.     Specifically, the Defendant Aircraft departed Boca Raton, Florida, for St. Vincent and the Grenadines.

43.     About five hours after arriving in St. Vincent and the Grenadines, the Defendant Aircraft departed for Caracas, Venezuela.

44.     The Defendant Aircraft was accompanied from St. Vincent and the Grenadines to Venezuela by another aircraft bearing tail number YV3469 (the "YV3469 Aircraft").

45.     The YV3469 Aircraft belongs to the Government of Venezuela and operates out of a military base, Generalissimo Francisco de Miranda Air Base (formerly known as "La Carlota"), in Caracas.

46.     The two pilots who flew the Defendant Aircraft from St. Vincent to Caracas, (hereinafter "Foreign Pilot 1" and "Foreign Pilot 2") were or are members of the Venezuelan Presidential Honor Guard, a military brigade responsible for the immediate security of the Venezuelan president.

## II.     Failure to File an EEI or Obtain a License Prior to Exportation

47.     Shortly after its purchase, on or about January 25, 2023, the Defendant Aircraft was deregistered from its then Federal Aviation Administration ("FAA") registration, N900SJ, purportedly in preparation for export to the Republic of San Marino. The Defendant Aircraft was then registered in San Marino, which assigned it the registration mark and tail number T7-ESPRT. The Defendant Aircraft's serial number of 7, however, remains.

48.     Any time an aircraft departs the United States it is considered an "export." However, a particular export will either be (a) a "temporary export" that is intended to return to the U.S. within one year with no transfer of control, or (b) a "permanent export" where the aircraft is physically exported from the United States as part of a sale, lease or transfer of possession and control to a foreign person, or is otherwise intended to be based out of the United States for one year or more.

49.     In this case, the Defendant Aircraft's departure is considered a permanent export since it was sold to a foreign entity and has been based outside the United States for more than one year. Therefore, an EEI filing through AES was required prior to the Defendant Aircraft's departure from the United States.

50.     The Defendant Aircraft, however, permanently departed the U.S. without being properly declared for export on an EEI.

51.     Although Foreign Company 1 purchased the Defendant Aircraft from Florida Company 1 for the benefit of the Maduro Regime, no OFAC license was obtained for the sale and other related transactions.

52.     Also, because the Defendant Aircraft is on the CCL, a license was required from BIS for the Defendant Aircraft to be exported for use by the DGCIM and/or the Venezuelan National Armed Forces.

53.     In addition, no BIS license for the Defendant Aircraft was obtained before its exportation.

## III.    The Defendant Aircraft was purchased for the use and benefit of the Government of Venezuela and Maduro

54.     Since May 2023, the Defendant Aircraft has flown using tail number T7-ESPRT to/from Venezuela at least 21 times, including on the following occasions:

| Date | From | To |
|---|---|---|
| 5/28/2023 | Caracas, Venezuela | Brasilia, Brazil |
| 5/31/2023 | Brasilia, Brazil | Caracas, Venezuela |
| 6/1/2023 | Caracas, Venezuela | Unknown |
| 6/7/2023 | Unknown | Caracas, Venezuela |
| 6/20/2023 | Caracas, Venezuela | Unknown (Likely Bolivia) |
| 6/26/2023 | Caracas, Venezuela | Santo Domingo, Dominican Republic |
| 8/22/2023 | Caracas, Venezuela | Unknown |
| 8/25/2023 | Pretoria, South Africa | Caracas, Venezuela |
| 10/22/2023 | Caracas, Venezuela | Mexico |
| 10/23/2023 | Mexico | Caracas, Venezuela |
| 11/2/2023 | Caracas, Venezuela | Brazil |
| 11/3/2023 | Brazil | Caracas, Venezuela |
| 2/7/2024 | Caracas, Venezuela | Grenada |
| 2/21/2024 | Caracas, Venezuela | Havanna, Cuba |
| 2/22/2024 | Havana, Cuba | Mexico |
| 2/24/2024 | Mexico | Caracas, Venezuela |

| 2/25/2024 | Caracas, Venezuela | Havanna, Cuba |
| 2/26/2024 | Havana, Cuba | Caracas, Venezuela |
| 3/7/2024 | Havana, Cuba | Caracas, Venezuela |
| 3/10/2024 | Caracas, Venezuela | Bolivia |
| 3/12/2024 | Bolivia | Venezuela |

55.     Indeed, Maduro used the Defendant Aircraft as part of his Presidential convoy on several official visits to other countries, as illustrated in the following opensource news photo:



56.     The Maduro Regime has also used the Defendant Aircraft to conduct state business.

57.     For instance, on December 20, 2023, the Maduro Regime used the Defendant Aircraft in connection with a prisoner exchange involving a Venezuelan businessman who had been imprisoned in the U.S. on money laundering charges.

#### IV.     The Defendant Aircraft's Arrival in the Dominican Republic for Repairs

58.     On March 13, 2024, the Defendant Aircraft arrived in Santo Domingo, Dominican Republic, from Venezuela.

59.     On the March 13, 2024, flight, the Defendant Aircraft was flown by two members of the Venezuelan Presidential Honor Guard: Foreign Pilot 3 and Foreign Crew 1.

60.     The Defendant Aircraft was flown to the Dominican Republic for service and repair, to be performed by a Dominican-based jet maintenance business operated by a U.S. person ("Maintenance Company 1").

61.     Foreign Company 1 served as Maintenance Company 1's customer, holding itself out as the owner of the Defendant Aircraft.

62.     Maintenance Company 1 had received recent U.S.-origin aircraft avionics, including a radio altimeter listed on the CCL, which was exported from the U.S. and installed on the Defendant Aircraft.

63.     Maintenance Company 1 attempted to acquire the necessary parts for the Defendant Aircraft from two U.S.-based suppliers ("U.S. Supplier 1" and "U.S. Supplier 2").

64.     U.S. Supplier 1 had sold parts to Maintenance Company 1 for use on the Defendant Aircraft but later stopped after it became concerned that a sanctioned entity was using the Defendant Aircraft.

65.     U.S. Supplier 2's compliance department likewise rejected Maintenance Company 1's parts request due to the U.S. sanctions on the Government of Venezuela.

66.     Maintenance Company 1 was unaware that the Defendant Aircraft was purchased by Foreign Company 1 for the use and benefit of the Maduro Regime.

**V.      Venezuela's Attempts to Retrieve the Defendant Aircraft.**

67.      On May 20, 2024, Foreign Principal 1, purportedly acting on behalf of Foreign Company 1, arranged with Maintenance Company 1 to pick up the Defendant Aircraft in Santo Domingo.

68.      On the same day, five Venezuelan nationals arrived in the Dominican Republic on the YV3469 Aircraft from Venezuela to pick up the Defendant Aircraft.

69.      The flight manifest for the YV3469 Aircraft showed that the crew included Foreign Pilot 3, Foreign Crew 1, and another Venezuelan military member with a rank of major ("Foreign Crew 2").

70.      However, authorities in the Dominican Republic would not release the Defendant Aircraft.

71.      Shortly after, on the same day, the Venezuelan nationals departed back to Venezuela.

72.      On May 22, 2024, Venezuelan nationals again attempted to retrieve the Defendant Aircraft from the Dominican Republic.

73.      On May 22, 2024, a flight containing six Venezuelan individuals—two crew and four passengers—arrived in the Dominican Republic aboard an aircraft bearing Venezuelan tail number YV3226 (the "YV3226 Aircraft"). The flight manifest showed that the crew included Foreign Pilot 3, Foreign Crew 1, Foreign Crew 2, and three more Venezuelan military personnel, one lieutenant ("Foreign Crew 3") and two majors ("Foreign Crew 4" and "Foreign Crew 5").

74.      After arriving in the Dominican Republic, the Venezuelans filed a flight plan for the Defendant Aircraft to fly to Venezuela. The flight plan identified a crew of three (Foreign Pilot 3, Foreign Crew 1, and Foreign Crew 2) who would pilot the Defendant Aircraft—all of whom

had arrived that day on the YV3226 Aircraft.

75.    The Defendant Aircraft, however, was not permitted to leave the Dominican Republic, and all six Venezuelans returned to Venezuela on the YV3226 Aircraft the same day they arrived, according to the flight plan.

76.    On or about May 22, 2024, the United States obtained a seizure warrant for the Defendant Aircraft, which was transmitted to the Dominican Republic pursuant to Treaty. On or about May 23, 2024, the Defendant Aircraft was seized in the Dominican Republic and detained at Maintenance Company 1's hangar.

77.    Inside the Defendant Aircraft, law enforcement found, among other items, a list of Venezuelan military personnel of various ranks.

78.    On or about September 2, 2024, law enforcement flew the Defendant Aircraft back to the U.S., to Fort Lauderdale, Florida, where it remains as of today.

**VI.    The Maduro Public Statements Regarding the Defendant Aircraft**

79.    On September 2, 2024, Venezuela issued an official *Comunicado* concerning the seizure of the Defendant Aircraft that read:



80.     Translated, the *Comunicado* reads:



Bolivarian Republica of Venezuela

## Communiqué

The Bolivarian Republic of Venezuela denounces before the international community that once again, the authorities of the United States of America, in a recidivist criminal practice that cannot be qualified as anything other than piracy, has illegally seized an aircraft that has been used by the President of the Republic, justifying it by the coercive measures that it unilaterally and illegally imposes around the world.

This action reveals that no Nation and no constitutional government is safe from illegal actions that disregard international law. The United States has already demonstrated that it uses its economic and military power to intimidate and pressure countries such as the Dominican Republic to serve as accessories of its criminal acts. This is an example of the so-called "rules-based order," which seeks to establish the law of the strongest, create rules that suit its interests and execute them with total impunity, disregarding international law.



Bolivarian Republic of Venezuela

## Communiqué

The Bolivarian Republic of Venezuela reserves the right to take any legal action to repair this damage to the Nation, as well as all other damages caused by the criminal policy of unilateral coercive measures. Venezuela warns that this is not an isolated action. On the contrary, it is part of an escalation of actions against the Bolivarian Government of Venezuela, reelected last July 28 by the will of the majority of the Venezuelan people, which faithful to its anti-imperialist and anti-colonialist tradition will not be pressured by any aggression. Venezuela must be respected and will continue to firmly defend its dignity and sovereignty.

**Caracas, September 2, 2024**

81.     On September 10, 2024, Maduro held a press conference in which he called Dominican President Luis Abinader "a bandit, a thief," over the seizure of the Defendant Aircraft at the request of the United States.

82.     When discussing the then-upcoming U.S. Presidential debate, Maduro stated, "If they hadn't stolen my plane in the Dominican Republic, I would have gone there."[1]

## BASIS FOR FORFEITURE

83.     Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a "specified unlawful activity," or conspiracy to commit such an offense, is subject to civil forfeiture to the United States.

84.     A violation of IEEPA, 50 U.S.C. § 1705, or the smuggling statute, 18 U.S.C. § 554, constitutes a "specified unlawful activity" under 18 U.S.C. § 1956(c)(7)(D).

85.     Under 50 U.S.C. § 1705(a), IEEPA makes it a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any order, license, regulation, or prohibition issued under the statute.

86.     Under 50 U.S.C. § 1705(c), IEEPA also criminalizes willful violations of Executive Order 13884 and the Venezuela Sanctions Regulations, 31 C.F.R. part 591.

87.     The smuggling statute, 18 U.S.C. § 554(a), sets forth criminal penalties for "[w]hoever fraudulently or knowingly exports or sends from the United States, or attempts to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise, article or object, prior to exportation,

---

[1] https://www.barrons.com/news/venezuela-s-maduro-says-cannot-attend-us-presidential-debate-as-washington-stole-his-plane-fd5d4c35.

knowing the same to be intended for exportation contrary to any law or regulation of the United States[.]"

88.     Because 13 U.S.C. § 305 and 15 C.F.R. § 30.71 are "law[s] or regulation[s] of the United States," violations of those provisions in connection with the fraudulent or knowing export, or receipt or facilitation of transportation prior to exportation, can serve as the basis for a violation of the smuggling statute, 18 U.S.C. § 554.

89.     Under 13 U.S.C. § 305, "[a]ny person who knowingly fails to file or knowingly submits false or misleading export information through the . . . SED . . . (or any successor document) or the . . . AES . . . shall be subject to a fine not to exceed $10,000 per violation or imprisonment for not more than 5 years, or both."

90.     Similarly, 15 C.F.R. § 30.71 provides that "[a]ny person, including USPPIs [U.S. Principal Party in Interest], authorized agents or carriers, who knowingly fails to file or knowingly submits, directly or indirectly, to the U.S. Government, false or misleading export information through the AES, shall be subject to a fine not to exceed $10,000 or imprisonment for not more than five years, or both, for each violation."

91.     ECRA's forfeiture provision, 50 U.S.C. § 4819(d), states that "[a]ny person who is convicted under subsection (b) of a violation of a control imposed under section 4812 of this title (or any regulation, order, or license issued with respect to such control) shall, in addition to any other penalty, forfeit to the United States any of the person's property—(A) used or intended to be used, in any manner, to commit or facilitate the violation; (B) constituting or traceable to the gross proceeds taken, obtained, or retained, in connection with or as a result of the violation; or (C) constituting an item or technology that is exported or intended to be exported in violation of this subchapter."

92.     Under 50 U.S.C. § 4819(a)(1), ECRA makes it "unlawful for a person to violate, attempt to violate, or cause, a violation of this subchapter or of any regulation, order, license, or other authorization issued under this subchapter."

93.     Under, 50 U.S.C. § 4819(b), ECRA also provides criminal penalties for "[a] person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids and abets in the commission of, an unlawful act described in subsection (a)[.]"

94.     Under 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction in violation of money laundering offenses set forth in 18 U.S.C. § 1956, and any property traceable to such property, is subject to civil forfeiture to the United States.

95.     Under 18 U.S.C. § 1956(h), it is a federal crime to conspire to commit any money laundering offense in violation of 18 U.S.C. § 1956 or 1957.

96.     Under 18 U.S.C. § 1956(a)(1)(A)(i), it is a federal crime to, "knowing that the property involved in a transaction represents the proceeds of some form of unlawful activity, conduct[] or attempt[] to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . with the intent to promote the carrying on of specified unlawful activity."

97.     Under 18 U.S.C. § 1956(a)(2)(A), it is also a federal crime to, "transport[], transmit[], or transfer[], or attempt[] to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States … with the intent to promote the carrying on of specified unlawful activity."

### FIRST CLAIM
### Property Constituting or Derived from
### Proceeds Traceable to IEEPA Violations
### (18 U.S.C. § 981(a)(1)(C))

98.     The factual allegations in paragraphs 1 to 97 are re-alleged and incorporated by reference herein.

99.     As set forth above, the Defendant Aircraft was purchased and smuggled from the United States to Venezuela using a third-party straw purchaser, in violation of IEEPA.

100.    The true beneficial owner of the Defendant Aircraft is the sanctioned Maduro Regime.

101.    In addition, U.S. persons, including U.S. financial institutions and U.S. aircraft part suppliers, have provided, attempted to provide, or conspired to provide goods and services to and for the benefit of the Government of Venezuela in connection with the purchase and maintenance of the Defendant Aircraft, in violation of IEEPA.

102.    Accordingly, the Defendant Aircraft is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

### SECOND CLAIM
### Property Constituting or Derived from
### Proceeds Traceable to Smuggling
### (18 U.S.C. § 981(a)(1)(C))

103.    The factual allegations in paragraphs 1 to 97 are re-alleged and incorporated by reference herein.

104.    As set forth above, the Defendant Aircraft was purchased and smuggled from the United States to Venezuela using a third-party straw purchaser, in violation of 18 U.S.C. § 554(a), 13 U.S.C. § 305, and 15 C.F.R. § 30.71.

105.    The true beneficial owner of the Defendant Aircraft is the sanctioned Maduro

Regime.

106.     In addition, U.S. persons, including U.S. financial institutions and U.S. aircraft part suppliers, have provided, attempted to provide, or conspired to provide goods and services to and for the benefit of the Government of Venezuela in connection with the purchase and maintenance of the Defendant Aircraft, in violation of 18 U.S.C. § 554(a), 13 U.S.C. § 305, and 15 C.F.R. § 30.71.

107.     Accordingly, the Defendant Aircraft is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

**THIRD CLAIM**
**Property Constituting or Traceable to Gross Proceeds,**
**and Item or Technology Exported, in Violation of ECRA**
**(50 U.S.C. § 4819(d))**

108.     The factual allegations in paragraphs 1 to 97 are re-alleged and incorporated by reference herein.

109.     As set forth above, the Defendant Aircraft was purchased and smuggled from the United States to Venezuela using a third-party straw purchaser, in violation of ECRA.

110.     The true beneficial owner of the Defendant Aircraft is the sanctioned Maduro Regime.

111.     In addition, U.S. persons, including U.S. financial institutions and U.S. aircraft part suppliers, have provided, attempted to provide, or conspired to provide goods and services to and for the benefit of the Government of Venezuela in connection with the purchase and maintenance of the Defendant Aircraft, in violation of ECRA.

112.     Accordingly, the Defendant Aircraft is subject to forfeiture to the United States pursuant to 50 U.S.C. § 4819(d).

## FOURTH CLAIM
### Property Involved in Money Laundering Conspiracy
### (18 U.S.C. § 981(a)(1)(A))

113.    The factual allegations in paragraphs 1 to 97 are re-alleged and incorporated by reference herein.

114.    As set forth above, funds were transported, transmitted and transferred from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States in connection with the purchase and maintenance of the Defendant Aircraft, with the intent to promote violations of IEEPA, ECRA, and 18 U.S.C. § 554.

**WHEREFORE**, the United States requests that this Honorable Court issue a warrant for arrest *in rem* for the Defendant Aircraft; that due notice issue to enforce the forfeiture and to give notice to all interested parties to appear and show cause why the forfeiture should not be decreed; that the Defendant Aircraft be condemned and forfeited to the United States of America for disposition according to law; and for such other and further relief as this Court may deem just and proper.

Respectfully submitted,

**HAYDEN P. O'BYRNE**
**UNITED STATES ATTORNEY**

By: /s/ *Jorge R. Delgado*
Jorge R. Delgado
Assistant United States Attorney
Florida Bar No. 084118
U.S. Attorney's Office
500 E. Broward Blvd., Suite 700
Fort Lauderdale, FL 33394
Telephone: (954) 660-5954
E-mail: Jorge.Delgado2@usdoj.gov

By: /s/ *Joshua Paster*
Joshua Paster, Court ID No. A5502616
Assistant United States Attorneys
99 N.E. 4th Street, 7th Floor
Miami, Florida 33132-2111
Telephone: (305) 961-9342
E-mail: joshua.paster@usdoj.gov

**JENNIFER KENNEDY GELLIE**
**Chief, Counterintelligence and Export Control**

By: /s/ *Ahmed Almudallal*
Ahmed Almudallal, Court ID No. A5503226
Trial Attorney, Counterintelligence & Export
Control Section, National Security Division
U.S. Department of Justice
950 Pennsylvania Avenue N.W.
Washington, DC 20530
Telephone: (202) 307-5785
E-mail: ahmed.almudallal@usdoj.gov

Counsel for the United States of America

## **VERIFICATION**

I, Robert Cunniff, hereby verify and declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that I am a Special Agent with the U.S. Department of Commerce Bureau of Industry and Security, Office of Export Enforcement ("OEE"), that I have read the foregoing Verified Complaint for Forfeiture *In Rem* ("Verified Complaint") and know the contents thereof, and the matters contained in the Verified Complaint are true to my own knowledge, except that those herein stated to be alleged on information and belief and as to those matters I believe to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Special Agent of OEE.

I hereby verify and declare under penalty of perjury that the foregoing factual allegations are true and correct to the best of my knowledge and belief.

EXECUTED, on this _7_ day of March 2025.

Robert Cunniff
Special Agent
U.S. Bureau of Industry and Security
Office of Export Enforcement

23